UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

National Union Fire Insurance Company of
Pittsburg, Pa.,

                    Plaintiff,

          v.

Cargill, Inc.,

                    Defendant.

Case No. 20-cv-0839 (WMW/JFD)


**ORDER GRANTING DEFENDANT'S
MOTION FOR JUDGMENT ON THE
PLEADINGS**

---

This matter is before the Court on the Defendant Cargill, Inc.'s (Cargill) motion for judgment on the pleadings.  (Dkt. 30.)  Cargill seeks judgment in its favor as to the one disputed claim between the parties and as to the issue of prejudgment interest. Plaintiff National Union Fire Insurance Company of Pittsburg, Pa. (National Union) opposes the motion.  For the reasons addressed below, Cargill's motion is granted.

**BACKGROUND**

National Union is an insurance company incorporated in Pennsylvania with its principal place of business in New York.  Cargill is a Delaware corporation with its principal place of business in Minnesota.  National Union issued a commercial crime insurance policy to Cargill, effective October 1, 2014, through June 15, 2016 (Policy). As relevant to this dispute, the Policy provides up to $25 million in insurance coverage with a $10 million deductible.  The employee theft clause of the Policy (Employee Theft Clause) provides that National Union, "will pay for loss of or damage to 'money' 'securities' and 'other property' resulting directly from 'theft' committed by an

'employee' whether identified or not, acting alone or in collusion with other persons." The Policy defines "theft" as, "unlawful taking of property to the deprivation of the Insured."

This insurance-coverage dispute arises from the fraudulent actions of Cargill's former employee, Diane Backis. Cargill employed Backis as a "Merchant/Admin Leader" in Cargill's Albany, New York, grain facility. Backis's job responsibilities included negotiating sales contracts with corn and sorghum customers. When conducting an internal audit, Cargill discovered uncharacteristically large accounts-receivable balances, which triggered a fraud investigation. Assisted by the Federal Bureau of Investigation (FBI), Cargill determined that between approximately December 2006 through June 2016, Backis misrepresented the prices that customers were willing to pay for corn and sorghum and made fraudulent entries in Cargill's accounting system to memorialize these fictitious higher prices. Backis's actions led Cargill to sell commodities at lower prices, leading Cargill to sustain approximately $32 million in losses, calculated as the "purchase price of corn and sorghum [that Cargill paid] less the cash receipts from corn and sorghum sales from June 1, 2007 through May 31, 2016." Backis subsequently pleaded guilty to one count of mail fraud and one count of filing a false tax return after admitting that she deposited at least $3,115,610.89 of Cargill's customers' payments into her personal bank accounts.

Cargill notified National Union of a purported employee-theft loss under the Policy. The parties jointly retained an independent "Investigative Specialist" to investigate the facts and determine the quantum of loss as to Cargill's claim and to create

a "FRISC Report."[1]   The Policy provides that the FRISC Report "issued by the Investigative Specialist *will be definitive as respects the facts and the quantum of loss* and shall be provided to both" Cargill and National Union.  (Emphasis added.)  The FRISC Report determined that, "[a]s a result of Ms. Backis' purchase of corn and sorghum at Albany's cost above selling price from [fiscal year] 2008 through her termination, Cargill was adversely impacted $32,115,192, which includes $3,115,611 in theft of cash."  Cargill sought insurance coverage for the loss it sustained as a result of Backis's actions identified in the FRISC Report.  National Union denied coverage.

Unable to resolve whether the Policy covers Cargill's losses as identified in the FRISC Report, National Union commenced this action seeking a declaratory judgment as to its contractual obligations.[2]  Cargill filed a counterclaim alleging breach of contract and now moves for judgment on the pleadings.

## ANALYSIS

### I.   Legal Standard

A party may file a motion for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The same legal standard used to evaluate a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., applies to a motion for judgment on the pleadings.  *See*

---

[1]   A "FRISC Report" is a Fidelity Research & Investigative Settlement Clause report that details the quantum of loss.

[2]   The parties agree that the $3,115,611 that Backis deposited into her personal bank accounts constitutes "theft" for purposes of the Policy.  However, because the Policy contains a $10 million deductible, $3,115,611 is insufficient to trigger insurance coverage.

*Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012). When determining whether a complaint states a facially plausible claim, a district court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). Factual allegations must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Legal conclusions couched as factual allegations may be disregarded. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court shall grant a motion for judgment on the pleadings when "the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001). When deciding such a motion, a district court considers the pleadings and documents necessarily embraced by the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir 1999). Documents are necessarily embraced by the pleadings when the pleadings allege the contents of the documents and no party questions their authenticity. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Notably, the contract on which a breach-of-contract claim rests ordinarily is embraced by the pleadings. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir. 2014). The Policy and the FRISC Report at issue here are embraced by National Union's complaint and Cargill's counterclaim, and neither party disputes the authenticity of the copies of these

documents included as exhibits to the pleadings.  As such, the Court may consider these documents when deciding Cargill's motion for judgment on the pleadings.[3]

## II.    Insurance Coverage

National Union's declaratory-judgment claim and Cargill's breach-of-contract counterclaim both pertain to whether Cargill is entitled to employee-theft coverage in excess of the $10 million deductible under the policy.

Minnesota state law governs the substantive issue of insurance coverage here.  *See Corn Plus Coop. v. Cont'l Cas. Co.*, 516 F.3d 674, 678 (8th Cir. 2008) (applying Minnesota substantive law to an insurance case in federal court based on diversity jurisdiction).   Under Minnesota law, the principles of contract law govern the construction of an insurance policy.  *Nathe Bros., Inc. v. Am. Nat'l. Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn. 2000).  The interpretation of an insurance policy presents a question of law, requiring a court to construe the policy "as a whole with all doubts concerning the meaning of language employed to be resolved in favor of the insured." *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn. 1994) (internal quotation marks omitted).  When an insurance policy is unambiguous, the "usual and accepted meaning" prevails.  *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998)

---

[3]    National Union argues that judgment on the pleadings should not be granted in Cargill's favor because there is information not addressed in the FRISC Report that *may* be material to the claims.  Here, the Policy provides that the FRISC Report is "definitive" as to the facts relevant to Cargill's quantum of loss.  And no party disputes the facts in the FRISC Report.  Therefore, although there might be facts not included in the FRISC Report, National Union fails to establish what, if any, material facts relevant to the Court's interpretation of the insurance contract were omitted from the FRISC report.

(internal quotation marks omitted).  The burden of proving coverage rests with the insured party.  *See UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 873 (D. Minn. 2014); *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013).

Here, the parties dispute whether Cargill has met its burden of demonstrating claim coverage.  Specifically, the parties dispute whether Cargill has demonstrated that Backis's actions resulted in a loss of other property "resulting directly from theft."  The Policy provides: "[c]overage is provided under the following Insuring Agreements . . . and applies to loss that you sustain resulting directly from an 'occurrence' taking place at any time . . . ."  The relevant "Insuring Agreement" in dispute is the Employee Theft Clause, which provides that National Union "will pay for loss of or damage to 'money,' 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee.'"  "Property" is limited to property that Cargill owns, leases, or is holding for others.  The disputed terms of the Policy are addressed in turn below.

### A.    "Resulting Directly From"

The parties dispute whether the losses Cargill sustained were the direct result of Backis's theft.  Cargill argues that it sustained losses resulting directly from Backis's actions because there was no intervening cause.  National Union disagrees.

The Policy does not define "directly."  Accordingly, this Court will apply the ordinary and popular meaning of the term.  *See Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 16 n.4 (8th Cir. 1968) (observing that, under Minnesota law, when interpreting an insurance contract, absent a definitional clause, it is proper for a court to

consider the dictionary meaning of the word).   Here, both parties cite Black's Law Dictionary to define "directly."   Black's Law Dictionary defines "directly" as "[i]n a straightforward manner," "[i]n a straight line or course," or "[i]mmediately."   *Black's Law Dictionary* 557 (10th ed. 2014).

The FRISC Report provides that "Backis controlled the pricing and recordkeeping elements of the sale" of corn and sorghum.   As part of her fraudulent scheme, Backis represented to Cargill in various ways, including through falsified sales contracts, that she was selling sorghum and yellow corn commodities at higher prices than she was.   In fact, Backis was selling these commodities at competitive market prices.   Ultimately, this fraudulent scheme led Cargill to sell commodities below cost between June 1, 2007, and May 31, 2016, the fraud period identified in the FRISC Report.   Neither party disputes that there is a causal relationship between Backis's actions and Cargill's losses or argues that another employee exercised control over aspects of the commodities transactions at issue.

The reasoning of the United States Court of Appeals for the Eighth Circuit in *Avon State Bank v. BancInsure, Inc.*, 787 F.3d 952 (8th Cir. 2015), is instructive.   In *Avon State Bank*, an employee's fraudulent actions led third parties to lose investment funds, resulting in the bank's insurance company being liable to those third-party investors for their losses.   787 F.3d at 955.   The Eighth Circuit held that the losses that the bank sustained were direct losses because the employee "acted fraudulently to benefit himself by protecting his interest and did so through acts which would necessarily make [the bank] liable to third parties."   *Id.* at 958.   Here, Backis's actions caused Cargill

necessarily to lose money because Cargill sold commodities below cost. Indeed, Cargill's losses are even more direct than those sustained in *Avon State Bank* because the bank in that case sustained losses only through third-party liability. *See id.* Moreover, any doubts as to whether the losses here resulted "directly" from Backis's actions are resolved in favor of the insured. *Haarstad*, 517 N.W.2d at 584.

National Union relies on *Alerus Financial National Association v. St. Paul Mercury Insurance Co.* to support its argument that Backis did not directly cause Cargill's loss. No. 27-CV-09-3344, 2010 WL 5651445 (Minn. Dist. Ct. June 28, 2010). But *Alerus* is inapposite for at least two reasons. First, *Alerus* involved bond forgery clauses, which are not at issue here. *Id.* Second, in *Alerus* an employee forged securities, which were valueless, to serve as collateral for loans. *Id.* For that reason, even if the signatures had been valid, no losses would have occurred because the securities lacked value to begin with. Here, no party argues that the commodities were valueless. For these reasons, *Alerus* does not govern this Court's analysis.

In summary, because Cargill's losses at issue here resulted directly from Backis's actions, this term of the Policy is satisfied.

**B.    "Theft"**

The Policy provides coverage for "theft," which the Policy defined as "the unlawful taking of property to the deprivation of the Insured." The principal dispute between the parties is whether the losses that Cargill sustained by selling the commodities below cost constitute an "unlawful taking" under the Employee Theft Clause of the Policy.

The parties dispute the relatedness of Backis's direct theft of approximately $3 million with the additional losses that Cargill sustained in excess of $25 million as a result of Backis selling commodities below cost. Cargill argues that "Backis admitted in her plea agreement to stealing more than $25,000,000 from Cargill" whereas National Union argues that the FRISC Report definitively concluded that there is "no connection between Backis's embezzlement and the pricing misrepresentations." National Union maintains that Backis's pricing-misrepresentation scheme is separate from her embezzlement scheme.

In her plea agreement, Backis agreed that "the intended loss amount . . . is at least $25,000,000." The FRISC Report concludes that "Cargill was adversely impacted [in the amount of] $32,115,192, which includes $3,115,611 in theft of cash." According to the FRISC Report, "Cargill incurred losses of $32,115,192 as a result of Ms. Backis misrepresenting the price" of Cargill's commodities. The FRISC Report definitively concludes that Cargill sustained losses of $32,115,192.

Cargill contends that the Employee Theft Clause of the Policy encompasses Backis's fraudulent scheme and the $32,115,192 quantum of loss. National Union counters that, when multiple schemes are at issue, courts recognize only schemes involving theft to be covered under employee theft insurance policies. In advancing this argument, National Union relies on *Pine Belt Automotive, Inc. v. Royal Indemnity Co.*, No. 06-5995, 2008 WL 4682582 (D.N.J. Oct. 21, 2008), *aff'd*, 400 F. App'x 621 (3d Cir. 2010). In *Pine Belt*, an automobile dealership employee falsified credit applications provided to a third-party loan issuer, leading to the issuance of loans that would not

otherwise have been issued.   2008 WL 4682582, at *2–3.   Upon discovering the employee's fraud, the automobile dealership sought coverage from its insurers under employee-theft insurance policies.  *Id*. at *3.  The insurers denied coverage.  The district court concluded that the loss sustained by the automobile dealership was not a "taking" and, therefore, was not a theft under the insurance policy.  *Id.* at *6.

Cargill argues that *Pine Belt* is distinguishable on many grounds, including the fact that Cargill is not seeking coverage for third-party liability and that the employee in *Pine Belt* lacked control over the surrender of the funds.  The Court agrees.  A taking requires exercise of possession or control.  *See Black's Law Dictionary* 1682 (10th ed. 2014) (defining "taking" as an "act of seizing an article, with or without removing it, but with an implicit transfer of possession or control").  In *Pine Belt*, although the defrauding employee's actions ultimately led the dealership to sustain a loss through its third-party liability, the employee did not exercise control over the funds transferred from the dealership to the loan issuer.  For this reason, *Pine Belt* does not govern this Court's analysis.

The parties also dispute whether a "taking" requires physical possession of the purportedly stolen property.  Cargill argues that a taking under the Policy is not limited to physical possession.  National Union disagrees.

Because the term "taking" is not defined by the policies, case law interpretations are relevant.  *Cf. Am. Fam. Ins. Co. v. Walser*, 628 N.W.2d 605, 610 (Minn. 2001) (observing that case law definitions are unnecessary when the contract specifically defines a disputed term).  Minnesota courts have not defined what constitutes a "taking"

under employee theft insurance policies.  A court in this District, however, recently rejected the argument that a "taking" for purposes of employee theft requires a physical act.  *Sherwin-Williams Co. v. Beazley Ins. Co.*, No. 18-cv-02964 (DWF/DTS), 2020 WL 4226866, at *4 (D. Minn. July 23, 2020).  Other courts also have rejected similar arguments.  *See Whitney Equip. Co. v. Travelers Cas. & Sur. Co. of Am.*, 431 F. Supp. 3d 1223, 1227 (W.D. Wash. 2020); *see also Tesoro Refin. & Mktg. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 96 F. Supp. 3d 638, 647 (W.D. Tex. 2015) (observing that the Black's Law Dictionary definition of "taking" "does not require physical possession of the seized article, but does require, at a minimum, that the actor exert control over the article such that possession or control is transferred"), *aff'd*, 833 F.3d 470 (5th Cir. 2016).

The Policy at issue here does not define a "taking."  And Minnesota law does not limit a "taking" under employee theft insurance coverage to physical takings.  For these reasons, there is no basis for the Court to impose such a limitation here.

National Union next argues that, for there to be covered losses, the employee must have "received something unlawfully as a result of the fraudulent conduct."  Cargill counters that the Policy "does not limit coverage only to the property or money taken to the deprivation of Cargill."

As addressed above, the Employee Theft Clause does not define "taking."  Black's Law Dictionary defines "taking" as "[t]he act of seizing an article, with or without removing it, but with an implicit transfer of possession or control."  *Black's Law Dictionary* 1682 (10th ed. 2014).  Here, the Employee Theft Clause does not address employee gain, nor does the definition of "taking" support such an interpretation.  And

the overall purpose of an insurance policy is to cover the insured's losses, which may not directly correlate with the employee's gain. *See Whitney*, 431 F. Supp. 3d at 1227 (observing that "the insurer promised to cover [the insured's] loss, however, not the employee's gain"). As National Union identifies no Minnesota legal authority in support of its position that losses to the insured require a gain by the employee, Cargill need not demonstrate proof of employee gain in order for Cargill's losses to be covered under the Policy.

National Union next argues that Backis neither possessed Cargill's grain commodities nor controlled shipment of the commodities. A "taking" requires "an implicit transfer of possession or control." *Black's Law Dictionary* 1682 (10th ed. 2014). The FRISC Report provides that "Backis controlled the pricing and recordkeeping elements of the sale" of corn and sorghum. In doing so, Backis communicated and negotiated contracts with customers, recorded sales in Cargill's accounting system and oversaw accounting and invoicing for all corn and sorghum transactions.

Here, the scope of control that Backis exercised is similar to the scope of control exercised by the employee in *Whitney*, who manipulated company data to overstate profits, which triggered payment of employee bonuses. *Whitney*, 431 F. Supp. 3d at 1225. The policy in *Whitney* defined "theft" to include "the intentional unlawful taking of [m]oney . . . to the [i]nsured's deprivation." *Id.* At 1226. The *Whitney* court found that, when the contract terms were given their fair, reasonable and sensible construction, the employee's actions constituted "theft" under the insurance policy. *Id.* Similarly, in *Sherwin-Williams*, the employee approved inflated invoices, depriving the insured of

approximately $3.5 million.  2020 WL 4226866, at *1.  The court concluded that a reasonable juror could conclude that the employee's actions constituted theft.  *Id.* at *4.

Finally, the court resolves any doubts concerning the meaning of language contained in the Policy in favor of the insured.  *Haarstad*, 517 N.W.2d at 584. Accordingly, if any doubt remains as to what constitutes "theft," the Policy must be construed in Cargill's favor.

For all of these reasons, the pleadings and the undisputed facts necessarily embraced by the pleadings establish that Backis's conduct constitutes a "theft" under the Policy as a matter of law, and that Cargill's losses resulted directly from Backis's theft. Accordingly, Cargill's motion for judgment on the pleadings is granted.

### III.    Prejudgment Interest

Cargill argues that it is entitled to prejudgment interest in the amount of 10 percent per annum, or $6,058 per day, beginning on April 28, 2016, pursuant to Minn. Stat. § 60A.0811.  Although the parties agree as to the applicable statute and the dollar value of interest that accrues daily, the parties dispute the *date* on which interest begins to accrue.  National Union argues that, if judgment in Cargill's favor is proper, prejudgment interest did not begin to accrue on April 28, 2016, because Cargill failed to seek indemnification on that date.

"Prejudgment interest is a substantive matter of state law . . . ."  *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007).  Under Minnesota law:

> [a]n insured who prevails in any claim against an insurer
> based on the insurer's breach or repudiation of, or failure to
> fulfill, a duty to provide services or make payments is entitled

13

> to recover ten percent per annum interest on monetary
> amounts due under the insurance policy, *calculated from the
> date the request for payment of those benefits was made to the
> insurer.*

Minn. Stat. § 60A.0811, subdiv. 2(a) (emphasis added).  When applying Minn. Stat.

§ 60A.0811, it is not erroneous to "calculate[e] prejudgment interest from the date when

[the insured] first requested indemnification." *Avon State Bank*, 787 F.3d at 960.  And

one of the purposes of Minnesota's prejudgment-interest statutes is to motivate the

insurer and the insured to settle, even at the risk of overcompensating the insured.  *See*

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 918 (8th Cir. 2005)

(acknowledging that an insured might be "more than fully compensated" under

Minnesota's prejudgment-interest statutes).

Here, in an April 28, 2016 email to National Union, Cargill notified National

Union about the ongoing federal law enforcement investigation into Backis's conduct and

asked National Union to "[p]lease accept this [email] as formal notification of a claim

under the notice provisions" of the Policy.  Accordingly, interest begins accruing on

April 28, 2016. *See Avon State Bank*, 787 F.3d at 960 (affirming district court award of

prejudgment interest "from the date when [the insured] first requested indemnification"

for liability and defense costs in the underlying lawsuit).  Although National Union

argues that an insurer must first have an opportunity to determine whether or to what

extent any benefits are due under the policy, such a restriction is not found within the

plain language of the statutory text.  *See* Minn. Stat. § 60A.0811, subdiv. 2(a).  And

National Union identifies no binding or persuasive legal authority interpreting Minn. Stat.

§ 60A.0811, subdiv. 2(a), to include such a restriction.  To the contrary, the Eighth Circuit has recognized that Minnesota's prejudgment-interest statutes intentionally allow a party to accrue interest on damages *before* the amount of damages is "liquidated or readily ascertainable."  *Marvin Lumber*, 401 F.3d at 918; *accord Avon State Bank*, 787 F.3d at 960.  For these reasons, the Court will not impose such limiting language onto the statute.

Accordingly, prejudgment interest under Minn. Stat. § 60A.0811 accrues beginning on April 28, 2016.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.     Defendant Cargill, Inc.'s motion for judgment on the pleadings, (Dkt. 30), is **GRANTED**.

2.     Judgment shall be entered against Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa., and in favor of Defendant Cargill, Inc., in the amount of $22,114,883 plus 10 percent prejudgment interest per annum, or $6,058 per day, beginning on April 28, 2016, and ending on the date that judgment is entered in this case, pursuant to Minn. Stat. § 60A.0811, subdiv. 2(a).

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 24, 2021                                 s/Wilhelmina M. Wright
                                                                      Wilhelmina M. Wright
                                                                      United States District Judge